**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

AMBATO MEDIA, LLC,

                Plaintiff,

     v.

CLARION CO., LTD., *et al*.,

                Defendants.

CIVIL ACTION NO. 2:09-CV-242 (TJW)

**PLAINTIFF AMBATO MEDIA, LLC'S**
**OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................. 1

    A.   The '542 Patent ........................................................................................1

    B.   The Accused Instrumentality ...................................................................5

III. LEGAL STANDARDS ...................................................................................... 6

IV.  THE DISPUTED CLAIM TERMS IN THE '542 PATENT........................... 8

    A.   "generally broadcast data"......................................................................11

        1.   "generally broadcast data" should have its plain and ordinary
            meaning – "data broadcasted generally."....................................11

        2.   "Transmitted to all receivers" is different from "broadcasted." ...............11

        3.   The extra limitation of "within reception range of the broadcast" in
            Defendants' proposed construction has no basis. ....................................12

    B.   "location designation codes" ..................................................................12

        1.   "location" means "geographic location or area."......................................13

        2.   The extra limitations "variable" and "included in transmitted
            messages" in Defendants' construction are redundant and thus
            unnecessary. ...............................................................................................14

        3.   There is no need to replace "designate" with "identify."............................14

    C.   "variable".................................................................................................14

        1.   "Variable" has a special meaning in the '542 patent – "arbitrary."...........15

        2.   The concept of "arbitrary" is consistent with the '542 prosecution
            history. .......................................................................................................18

        3.   Defendants' proposed construction – "different" – not only lacks
            basis, but also conflicts with the teaching of the '542 patent. ..................18

        4.   Defendants' proposed construction – "different" – reads out a
            preferred embodiment of the '542 patent.................................................19

    D.   "means for receiving successive information units" .............................20

        1.   The specification discloses a receiver or a tuner for receiving
            successive information units. .....................................................................20

        2.   Even if it is a means-plus-function term, the structure in
            Defendants' proposed construction is too narrow and ignores the
            overall specification. ..................................................................................21

    E.   "coupled to a memory" ...........................................................................22

        1.   "coupled to a memory" should have its plain and ordinary meaning
            – "associated with a memory." .................................................................22

        2.   The limitation "separate from but connected to the input means and
            the receiver" in Defendants' proposed construction is imported
            from a preferred embodiment. ...................................................................23

    F.   "location selection code" .........................................................................24

        1.   "location" means "geographic location or area."......................................24

        2.   Selection "by the user" is not required. ....................................................24

G.    "input means coupled to the memory for loading said location selection code" ...........................................................................................................25

    1.    The input means can be a user input device or an automatic location-determination device, or its equivalent. .......................................26

    2.    The structure in Defendants' proposed construction is too narrow and ignores preferred embodiment. ..........................................................26

H.    "means for comparing the location selection code from the input means with the location designation codes of the successive information units as received by said means for receiving, and identifying an overlap" .....................27

    1.    The specification provides enough structure details for "means for comparing." ..................................................................................27

    2.    Even if WMS Gaming applies, the '542 specification provides ample details about the algorithms of "means for comparing." ...............28

I.    "comparing the location selection code … with the location designation codes" ............................................................................................................29

    1.    "location" means "geographic location or area." .......................................30

    2.    The word "compare" should have its plain and ordinary meanings – "examine in order to note similarities and differences." ......................30

    3.    Defendants' proposed construction contains the construction of "overlap" and therefore is redundant and unnecessary. ..........................30

J.    "as received" ..................................................................................................31

    1.    "as received" should have its plain and ordinary meaning – "when received." ...............................................................................31

    2.    The information received is not required to be "processed immediately without modification or other alteration." ...........................31

    3.    Defendants' proposed construction is not plain and ordinary meaning .................................................................................................33

K.    means for processing selected ones of the information units as a function of said overlap" ..............................................................................................33

    1.    The structure is a general processor. ........................................................34

    2.    The specification provides ample details about the algorithms executed on the general processor. ...........................................................34

L.    "automatic location sensor" ..........................................................................35

    1.    This term requires no construction beyond its plain and ordinary meaning – "a device sensing location automatically." ..............................35

    2.    Defendants' proposed construction is unnecessarily complicated ............35

V.    CONCLUSION ............................................................................................... 36

Per P.R. 4-5(a) and the Docket Control Order dated May 24, 2010, plaintiff Ambato Media, LLC (hereinafter, "Ambato" or "Plaintiff") respectfully submits this opening claim construction brief in support of its proposed constructions for the disputed claim terms in U.S. Patent No. 5,432,542 (hereinafter, "the '542 patent").

## I.  INTRODUCTION

Ambato commenced this action for infringement of the '542 patent.  Currently, Ambato has settled with all but essentially three defendants.  The remaining defendants (Garmin International, Inc., Nextar Inc., and Delphi Corporation) are collectively referred as "Defendants" hereinafter.  Defendants deny infringement of the '542 patent and assert, among other affirmative defenses, invalidity and/or unenforceability of the '542 patent.

Pursuant to the Local Rules and the Patent Rules, Ambato has met and conferred with Defendants multiple times trying to resolve the differences in claim construction.  Parties have reached agreement over three claim terms.  Twelve claim terms remain in dispute.

## II.  BACKGROUND

### A.  The '542 Patent

The '542 patent is entitled "Television Receiver Location Identification."  The invention disclosed in the '542 patent generally relates to an apparatus or process for entering location information in a terminal device (at times referenced as or including a TV set, a navigation device, other tuner-equipped devices) and enabling the terminal device to select location specific data from a generally broadcast stream of information.  Ex. A at 1:5-12.  Location specific messages are generally broadcast and selectively processed by the terminal device based on the one or more selected locations of interest.  *Id*. at Abstract; 3:42-47; 9:37-39.  (Often, the location of interest includes the location or destination of the user.)

More generally, transmitted messages contain information targeted for geographical locations or areas, with location designation codes accompanying the location-specific messages. A geographic location selection code can be loaded into the terminal device to define one or more selected locations of interest.  The terminal device receives the information segment and its designation code and compares the designated location to the selected one.  Messages where the designated and selected points or areas overlap are processed as desired, *e.g.*, are displayed, stored or used to trigger a warning.  For example, as set forth in the specification, a terminal device in an automobile can determine its location. *Id.* at 14: 42-60.  Transmitted information may contain location designation coding along with accompanying location specific information. The terminal device can then decode and display only the information relevant to that location. By way of further example, the terminal device in an automobile may select and display traffic, weather or commercial information for the selected location.  *Id.* at Abstract.

Arbitrary locations of interest in the '542 patent can be defined in various ways.  As stated in the patent, the "location selection code is variable and plural locations can be used and prioritized."  *Id.* at Abstract.  *Compare, Id.* at 2: 59-65.  The specificity of a location (*e.g.*, ranges of proximity) or a location within a region can also be arbitrarily defined.  Some examples of defining location or area are illustrated in FIG. 1 of the '542 patent.



FIG. 1

To determine if a broadcast message is "of interest" to the terminal device, certain comparison mechanisms are utilized. One such mechanism is to identify any overlap between the location encoded within the broadcast message and the selected location of the receiver. FIG. 3 of the '542 patent demonstrates a geometric intersection algorithm as one way of identifying an overlap.



FIG. 3

If any overlap is identified, the received message is deemed "of interest" and the terminal device processes this message as it wishes, *e.g.*, displays the message, shows warning to the user, etc.  If there is no overlap identified, the received message is deemed "not of interest" and the terminal device processes this message differently, *e.g.*, ignores the message.  An exemplary procedural flow is illustrated in FIG. 5 of the '542 patent.



**FIG. 5**

An exemplary arrangement according to the invention is illustrated in the block diagram in FIG. 6 of the '542 patent.  This arrangement includes an input means, a receiver, a processor for comparing and/or processing messages, and a memory for storing location selection.



FIG. 6

With this unique design, the end user of the terminal device can avoid being flooded with irrelevant broadcast messages and arrange to see, store, or otherwise process only relevant ones. *Id.* at 4:41-50. In addition, encoding of the location information in broadcast messages and in terminal devices allows location-specific processing of generally broadcast data without requiring complex time or frequency multiplexing. *Id.* at 4:41-44. The method and apparatus also enables versatility with the ability to designate arbitrarily defined position information and areas. *Id.* at 3: 6-19; 43-47.

**B.    The Accused Instrumentality**

Defendants make, use, sell, and/or offer to sell navigation devices, such as Garmin nüvi 1450, Nextar Q4-MD, and Dephi NAV200. Some of these navigation devices are portable; others are built into vehicles. A radio receiver capable of receiving broadcast messages either is

built into these navigation devices or comes with these navigation devices as an accessory. Defendants also sell radio receivers separately that can be coupled with compatible navigation devices. The accused navigation devices, in combination with the corresponding radio receivers, constitute the "Accused Instrumentality" in this case. Based on currently available information, there are no material differences for purposes of infringement among any particular combinations of accused navigation devices and compatible radio receivers.

In a typical arrangement, a radio receiver is capable of receiving and decoding broadcast messages. Broadcast messages contain location-specific information, such as a traffic incident at a particular location, weather information of a particular region, movie showtime information of a particular theater, and gas prices of a particular gas station. A compatible navigation device coupled with the radio receiver is able to receive those messages, determine if any messages are "of interest" or relevant, and process those relevant messages accordingly. For example, it can be configured to display only the traffic incidents on the planned route and ignore those far away, show only gas prices of those gas stations close by or on the planned route, or present only local weather information at the planned destination. All "not of interest" or irrelevant information is ignored or filtered out to minimize the distraction to the driver.

## III.   LEGAL STANDARDS

Courts decide claim construction as a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-971 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). In resolving claim construction disputes, courts consider three "intrinsic" sources: (1) the claims; (2) the patent specifications; and (3) the prosecution histories. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Courts may also rely on extrinsic evidence, such as dictionaries or treatises. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005).

As reaffirmed by the Federal Circuit in its *en banc Phillips* decision, "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312.  Not even the patent specification can itself "delimit [this right.]  That is the function and purpose of claims." *Id*.  This is a "bedrock principle" of patent law. *Id.*  As such, claim terms are typically defined with their ordinary and customary meaning to one of ordinary skill in the art at the time of the invention. *Id.* at 1313.  Where an ordinary meaning is readily apparent, the court must simply apply the widely accepted meaning of the commonly understood words. *Id.* at 1314; *Accumed LLC v. Stryker Corp.*, 483 F.3d 800, 805 (Fed. Cir. 2007)  ("[t]he task of comprehending th[e] words [of a claim] is not always a difficult one.").

Next to the claims themselves, the specification is the most important type of intrinsic evidence to be considered in order to ensure that the claims are interpreted consistently. *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003).  The specification should not, however, be read in a way that limits the scope of the invention to a preferred embodiment described in the specification. *Phillips*, 415 F.3d at 1323.  The written description cannot limit the scope of the invention as claimed where it is intended to describe just one way of practicing the invention. *Id.*  "The mere repetition in the written description of a preferred aspect of a claimed invention does not limit the scope of an invention that is described in the claims in different and broader terms." *Laitram Corp v. NEC Corp.*, 163 F.3d 1342, 1348 (Fed. Cir. 1998).  In addition, the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1323.

The prosecution history is less useful in construing the claims because it "lacks the clarity of the specification;" it can be considered, however, to provide evidence of how the PTO and the

inventor understood the patent. *Phillips*, 415 F.3d at 1317. Thus, the prosecution history can only serve to narrow claim scope in limited situations. The Federal Circuit has set a high standard: "[f]or a prosecution statement to prevail over the plain language of the claim, the statement must be clear and unmistakable such that the public should be entitled to rely on any 'definitive statements made during prosecution.'" *Elbex Video, Ltd. v. Sensormatic Electronics Corp.*, 508 F.3d 1366, 1373 (Fed. Cir. 2007). Ambiguous disclaimers do not aid the public notice function of a patent, and therefore cannot be used to limit a claim term's ordinary meaning. *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005).

Dictionaries and treatises may still be consulted and even used to construe claim terms as long as they do not contradict the intrinsic evidence. *Phillips*, 415 F.3d at 1322-1323. Under *Philips*, a trial court is not required to follow any set formula to construe the disputed claims "[n]or is the court barred from considering any particular sources or required to analyze sources in any specific sequence..." *Phillips*, 415 F.3d at 1324. Instead, *Philips* provides a guide to those sources that should be generally given more weight than others. *Id.*

## IV. THE DISPUTED CLAIM TERMS IN THE '542 PATENT

Claims 36, 38, and 39 of the '542 patent, all apparatus claims, are asserted in this litigation. Claim 36 is an independent claim; claim 38 is dependent upon claim 36; and claim 39 is dependent upon claim 38. The three asserted claims are copied below. The disputed claim terms in claims 36 and 38 are underlined. There are no disputed terms in claim 39.

> 36. An apparatus for location specific processing of <u>generally broadcast data</u>, the data including successive information units containing respective <u>location designation codes</u> that are <u>variable</u> among the successive information units, comprising:
>
> > <u>means for receiving successive information units, coupled to a memory</u> operable to store a <u>location selection code</u>;
> > <u>an input means coupled to the memory for loading said location selection code</u>;

> means for comparing the location selection code from the input
>     means with the location designation codes of the successive
>     information units as received by said means for receiving, and
>     identifying an overlap;
> means for processing selected ones of the information units as a
>     function of said overlap.

(Ex. A at 20:6-22.)

> 38. The apparatus according to claim 36, wherein the input means
> comprises an automatic location sensor.

(*Id.* at 20:26-27.)

> 39. The apparatus according to claim 38 wherein the automatic location
> sensor is associated with a mobile unit, and is operable to update said
> location selection code.

(*Id.* at 20:28-31.)

Claim 36, as indicated in its preamble, claims an apparatus for location specific processing of generally broadcast data. *Id.* at 20:6-7. Also as described in the claim 36 preamble, the generally broadcast data includes successive information units; the successive information units contain respective location designation codes; and the location designation codes are variable. *Id.* at 20:7-10. Claim 36 then sets forth the components for such an apparatus.

The apparatus of claim 36 contains a means for receiving the successive information units. This means for receiving is coupled to a memory. And the memory is operable to store a location selection code. *Id.* at 20:11-13. The apparatus of claim 36 also contains an input means (which may employ a global positioning system or "GPS") for loading the location selection code. *Id.* at 14:54-55. This input means is coupled to the memory. *Id.* at 20:14-15. The apparatus of claim 36 further contains a means for comparing the location selection code received from the input means with the location designation codes in the transmitted information,

and identifying an overlap. *Id.* at 20:16-20. And last, the apparatus of claim 36 contains a means for displaying information units selected as a function of the overlap. *Id.* at 20:21-22.

Claims 38 and 39 set forth additional features of the apparatus of claim 36. Claim 38 claims an enhanced form of the apparatus of claim 36, in which the "input means comprises an automatic location sensor." *Id.* at 20:26-27. Claim 39 further claims an enhanced form of the apparatus of claim 38, in which the "automatic location sensor is associated with a mobile unit, and is operable to update said location selection code." *Id.* at 20:28-31.

Ambato and Defendants have agreed to the constructions of the following three claim terms:

| '542 Claim Term | Agreed Construction |
| --- | --- |
| location specific processing | displaying, storing or using information based upon a location of interest |
| successive information units | information segments in a sequence |
| overlap | intersection of the geographic location or area indicated by the location selection code and the geographic location or area indicated by the location designation code |

Twelve claim terms in the '542 patent remain in dispute. Ambato's proposed constructions are consistent with their use in the claims as well as in the specification and file history. Ambato's proposed constructions should be adopted. In contrast, Defendants' proposed constructions would: (1) result in reading limitations into the claims from the preferred embodiment and the specification; (2) conflict with the claim language and the specification; (3) cause the disputed claim terms to lose their context within the claims; (4) make otherwise clear terms confusing; and (5) be unnecessarily complicated.

The disputed terms are discussed below in the order they appear in claims 36 and 38.

### A.      "generally broadcast data"

| Ambato's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning; however, to the extent that this term must be construed, it is synonymous with "data broadcasted generally." | data that is transmitted to all receivers within reception range of the broadcast |

### 1.      "generally broadcast data" should have its plain and ordinary meaning – "data broadcasted generally."

No intrinsic evidence provides a special meaning for the term "generally broadcast data" in the claims of the '542 patent.  Hence, the ordinary and customary meaning to a person of ordinary skill in the art at the time of the invention applies.  *Phillips*, 415 F.3d at 1313.  Where an ordinary meaning is readily apparent, the court should apply the widely accepted meaning of the commonly understood words.  *Id.* at 1314.

Ambato did not select this term for claim construction when parties exchanged the list of claim terms pursuant to P.R. 4-1, because this term's plain and ordinary meaning is simple and straightforward. Since the plain and ordinary meaning suffices here, Ambato proposes that this term should mean "data broadcasted generally."  Ambato's proposed construction is simple and, more importantly, does not change the original meaning of this term.

### 2.      "Transmitted to all receivers" is different from "broadcasted."

Ambato's proposed construction of "data broadcasted generally" is consistent with the '542 specification throughout.  For example:

- "Transmission of information to a set-top unit can be by any *broadcast* method. Presently available methods include, for example, cable, radio broadcast, fiber-optic or other information transmission channels, digital and analog signals, or hybrids of both, private carriers and common carriers, and other *broadcast* methods."  Ex. A at 5:32-37 (emphasis added).
- "The information is *broadcast* to all receivers, but only the subscribers can use it." *Id.* at 2:11-12 (emphasis added).
- "Inasmuch as geographic information is the basis of selection, broadcasts which are usefully interpreted by geographic location of the receiver need only be *broadcast* with their geographic information attached, rather than having to *broadcast* separately

by unique ID or entitlement code to individual receivers known to be located in a given area, or to have to *broadcast* the same information on a plurality of frequencies simultaneously, or to have to *broadcast* uniformly to all receivers in a general broadcast." *Id.* at 5:10-19 (emphasis added).

Defendants, however, try to substitute "broadcast" with "transmitted to all receivers." Defendants' proposed construction not only has no support in the intrinsic evidence but also may change the original meaning of this claim term. "Transmitted to all receivers" implies that the information being transmitted must be directed to and/or received by all receivers. Common sense tells us that many broadcast mechanisms, such as wireless signal, are inherently unreliable. In addition, the fact that information is broadcasted does not mean that the information is transmitted to or received by all receivers or that all receivers (including TV, radio, and those receivers utilizing foreign or domestic standards) are arranged to receive all data.

### 3. The extra limitation of "within reception range of the broadcast" in Defendants' proposed construction has no basis.

Defendants also try to add an extra limitation of "within reception range of the broadcast" into their proposed construction. This extra limitation has no basis in the intrinsic or extrinsic evidence. In addition, Defendants' proposed construction turns a three-word simple and straightforward term into a thirteen-word construction, which is unnecessarily cumbersome and changes the meaning of the original term.

Defendants' proposed construction should be rejected; and this term should be construed according to its plain and ordinary meaning – "data broadcasted generally."

### B. "location designation codes"

| Ambato's Construction | Defendants' Construction |
|---|---|
| codes designating geographic locations or areas | variable codes included in transmitted messages that identify locations |

**1.      "location" means "geographic location or area."**

The word "location" here means "geographic location or area." This usage is consistent

throughout the '542 specification.  For example:

- "Transmitted messages contain information targeted to *geographical* groups of users, with location designation coding accompanying location-specific messages."  Ex. A at Abstract (emphasis added).
- "Moreover, known location distinctions are limited to the location of the receiver and are inapplicable to arbitrary ranges of proximity, selection via a plurality of *geographic* locations and/or areas of interest, and the like, which would enable generally broadcast information to be filtered for geographically pertinent information."  *Id.* at 2:59-65 (emphasis added).
- "According to a preferred embodiment, a set-top receiver such as a cable interface device or the like includes a processor, or at least a comparator, which is encoded at least with its own *geographic* location, e.g., via latitude, longitude, and preferably altitude."  *Id.* at 3:52-56 (emphasis added).
- "A plurality of *geographic* areas of interest, each being arbitrarily selected by the user, can be designated. The user of the receiver, rather than only the broadcaster, has the ability to define which *geographic* area or areas are of interest to the user. Inasmuch as *geographic* information is the basis of selection …"  *Id.* at 5:4-11 (emphasis added).

In addition, the concept of "location" covers both a pinpoint location and a region with

greater than zero area.  This concept has ample intrinsic evidentiary support.  For example:

- "Moreover, known location distinctions are limited to the location of the receiver and are inapplicable to arbitrary ranges of proximity, selection via a plurality of geographic *locations and/or areas of interest*, and the like, which would enable generally broadcast information to be filtered for geographically pertinent information."  *Id.* at 2:59-65 (emphasis added).
- "A plurality of geographic *areas of interest*, each being arbitrarily selected by the user, can be designated. The user of the receiver, rather than only the broadcaster, has the ability to define which geographic *area or areas* are of interest to the user."  *Id.* at 5:4-9 (emphasis added).
- "At a minimum, the region has no extension in any dimension, being a single point."  *Id.* at 7:32-34 (emphasis added).

Thus, "location" here means "geographic location or area."

2.  **The extra limitations "variable" and "included in transmitted messages" in Defendants' construction are redundant and thus unnecessary.**

Defendants try to introduce the extra limitations "variable" and "included in transmitted messages that identify locations" into the construction of the term "location designation codes." These two extra limitations are redundant and unnecessary. The preamble of claim 36 reads as follow:  "An apparatus for location specific processing of generally broadcast data, the data including *successive information units containing* respective *location designation codes* that are *variable* among the successive information units …"  *Id.* at 20:6-10 (emphasis added).  As the preamble language explicitly and unambiguously states, the word "variable" is already a modifier with respect to "location designation codes"; and location designation codes are already referenced as contained in the successive information units.  Adding these two extra limitations into the construction of the term "location designation codes" is plainly redundant and thus unnecessary.

3.  **There is no need to replace "designate" with "identify."**

Defendants also try to replace "designate" with "identify" in their proposed construction. These two words "designate" and "identify" have little difference in their meanings in this context.  Changing "designate" to "identify" does not make the claim term simpler or easier to understand.  In fact, this pointless replacement may introduce unnecessary confusion to the Court and the jury, and therefore should be rejected.

Therefore, the term "location designation codes" should mean "codes designating geographic locations or areas."

C.  **"variable"**

| Ambato's Construction | Defendants' Construction |
|---|---|
| arbitrary | different |

In claim 36, the term "variable" applies to both "location designation codes" and "location selection code."  The '542 prosecution history offers clear and unambiguous support for Ambato's construction.

> "The claims have been amended to make clear that both location designation codes (associated with the transmitted messages) and location selection codes (determined at the receiver) are involved, and *both the location designation codes and the location specification codes are variable codes* rather than addressed communications to a predetermined subset of subscribers, e.g., known to be at a certain location. This aspect of the invention provides advantages that are not at all apparent from the prior art."  Ex. B at AMBATO 087 (emphasis added).

And Ambato and Defendants agree that the term "variable" in claim 36 modifies both "location designation codes" and "location selection code."  See Sections IV-B and IV-F for details.

### 1.    "Variable" has a special meaning in the '542 patent – "arbitrary."

It is a well-established axiom in patent law that "a patentee is free to be his or her own lexicographer" by choosing his or her own definition of a term.  *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1563 (Fed. Cir. 1990).  A patentee may give a term a special meaning so long as the written description is clear and consistent with respect to this special meaning.  *See, e.g., Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 1999).  Throughout the '542 patent, the patentees clearly and consistently give a special meaning to the term "variable" – it means "arbitrary."

### a.    Locations or areas of interest are arbitrary.

First, locations or areas of interest are arbitrary in the '542 patent.  The '542 patent announces in its very first sentence that the systems featured in the '542 patent support *arbitrary* locations of interests:  "Location specific messages or programming are generally broadcast and selectively filtered by user terminals which have encoded one or more *arbitrary* locations of interest."  Ex. A at Abstract.  The '542 specification goes on to describe some prior art systems

in its "Background of the Invention" section.  One significant drawback of the prior art systems

is: "these *invariable* geographic definitions lack the *versatility of arbitrarily defined areas*, and

the specificity of more localized location identifications that could render an information

distribution system useful for local commercial offers and the like." *Id.* at 3:2-10 (emphasis

added).  The systems featured in the '542 patent provide advantages over the prior art system, at

least because they "can respond to a designation of *arbitrary locations*, immediately and

accurately receives the geographically targeted information … " *Id.* at 3:25-27 (emphasis

added).  When "arbitrary" is used in its mathematical sense, it means "not assigned to a specific

value." Ex. C at AMBATO 37080.  As a result, the codes are variable and flexible.

The '542 specification then starts its "Summary of the Invention" section by emphasizing

that "an object of the invention to enable identification of receivers to selectively process

generally broadcast data or programming, by means of encoding *arbitrary position information*

respecting one or both of the content of the generally broadcast information and the area of

interest of a user of the receiver." *Id.* at 3:44-45 (emphasis added).  The concept of location

being arbitrary is consistent throughout the rest of the '542 specification.  For example:

- "Thus the borders of the region can be defined by points, lines, distances from points or lines, and by any other *arbitrarily selected designation* of a subset of all the area within the potential universe of interest." *Id.* at 11:44-48 (emphasis added).
- "The processor has a stored location selection, which can default to a selection based on the location of the receiver, and which can include or be replaced by any *arbitrary selection* made from user input." *Id.* at 14:1-5 (emphasis added).

**b.** **Specificity of location information or ranges of proximity are arbitrary.**

Second, in the '542 patent, not only the location information itself is arbitrary; but also

the specificity of location information or the ranges of proximity are arbitrary.  The '542

16

specification discusses another significant drawback of the prior art systems – they don't provide the specificity of location information or ranges of proximity. For example:

- "Although these devices permit selection of a subset of users who can use a generally broadcast message, their application to filtering information based upon *arbitrary locations or ranges of locations* are limited due to the need to define locations and to convert such information into the very different methods by which the users are rendered distinct from one another." *Id.* at 2:28-35 (emphasis added).
- "Moreover, known location distinctions are limited to the location of the receiver and are inapplicable to *arbitrary ranges of proximity* …" *Id.* at 2:59-65 (emphasis added).

The systems featured in the '542 patent distinguish those prior art systems, at least because they are "capable of *distinguishing locations to a degree* which is useful in connection with the information being transmitted, and the *specificity of this information can be variable*." *Id.* at 8:61-64 (emphasis added).

### c.      Locations or areas within a region are arbitrary.

Third, in addition to the location information itself and the specificity of location information being arbitrary, even the locations or areas within a region are arbitrary in the '542 patent. Unlike those prior art systems where certain location designation only corresponds to a region but not subareas within the region, the systems featured in the '542 patent can specify any arbitrary locations or areas within a region, thanks to the arbitrariness of the location information. For example:

- "The set top location need not be centered in the region of interest, as illustrated by region 120 in FIG.1. The location 122 can be at any *arbitrary location within the region* …" *Id.* at 10:55-58 (emphasis added).
- "A region may also be designated by a set of points, such as region 130 in FIG. 1 surrounding the location 132, *located arbitrarily within the region*." *Id.* at 11:36-38 (emphasis added).

### 2. The concept of "arbitrary" is consistent with the '542 prosecution history.

Ambato's proposed construction of "variable" as "arbitrary" is also consistent with the '542 prosecution history. On September 21, 1994, the patentees amended the claims and remarked that both the location designation codes and the location selection code are variable, not predetermined.

> "The claims have been amended to make clear that both location designation codes (associated with the transmitted messages) and location selection codes (determined at the receiver) are involved, and both the location designation codes and the location specification codes are *variable codes rather than* addressed communications to a *predetermined* subset of subscribers, e.g., known to be at a certain location. This aspect of the invention provides advantages that are not at all apparent from the prior art." Ex. B at AMBATO 087 (emphasis added).

This "not predetermined" concept is consistent with Ambato's proposed construction of "arbitrary."

### 3. Defendants' proposed construction – "different" – not only lacks basis, but also conflicts with the teaching of the '542 patent.

Defendants' proposed construction – "different" – has no intrinsic evidence support. Nothing in the '542 specification or file history offers the slightest support that "variable" here means "different."

More importantly, construing "variable" to mean "different" conflicts with the teaching of the '542 patent. Transmission of location specific information, as disclosed in the '542 patent, can be used with "any broadcast method." Ex. A at 5:32-33. Because of the inherent unreliability of some broadcast methods (e.g., wireless signal), redundancy is built into various broadcast mechanisms. That is, information specific to a particular location or area may be broadcasted repeatedly with the same location designation code. In addition, some successive information units (weather, traffic, etc.) logically may be designated for the same area. Thus, the location designation code in one message can be the same as that in the previous message and

18

can also be the same as that in the next message.  Of course, the location designation code can change from one information unit to the next, but it is not required to change and in many situations does not.  That is not the overly restrictive and unsupported meaning of variable in the claim.

The '542 specification is consistent throughout with regard to this redundancy.  In particular, the '542 specification consistently uses plural forms when describing messages containing location specific information.  This indicates that multiple messages can contain information specific to a particular location or area (with the same location designation code).  For example:

- "Transmitted message*s* contain information targeted to geographical groups of users, with location designation coding accompanying location-specific message*s*."  *Id.* at Abstract (emphasis added).
- "Segment*s* where the designated and selected points or areas overlap are processed, e.g., being displayed, stored or used to trigger a warning."  *Id.* (emphasis added).

As described above, the redundancy of location specific information in the broadcast messages leads to repetition of the same location designation code.  Therefore, "variable" here can not mean "different."

### 4.    Defendants' proposed construction – "different" – reads out a preferred embodiment of the '542 patent.

A claim construction that reads out a preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support."  *Vitronics Corp.*, 90 F.3d at 1583.  In one preferred embodiment according to the invention featured in the '542 patent, following an initial transmission of the mapping information, *later message*s contain location specific information of a same location (with the same location designation code); and *repetitive* transmission is needed for it to be successful.  For example:

19

"… it may be *more effective* to transmit the name, or a suitably encoded representative of the name, to the receiver. The mapping of the names, or their encoded representation, to the actual regions, can be broadcast separately and stored in the set top unit. An example would be to transmit a county name and the region defining it, whereupon *later messages intended for county* residents transmit only the county name as a shorthand location designation. For this to be successful, *repetitive transmission* of the mapping and their shorthand codes are needed to guarantee that all set top units contain the mapping."  Ex. A at 55-66 (emphasis added).

Defendants' proposed construction "different" would read out this preferred embodiment which requires redundancy and repetitive transmission of messages with the same location designation code.  Because the intrinsic record does not clearly and unmistakably compel such an extreme, disfavored result, Defendants' arguments must fail.

Therefore, "variable" should be construed as "arbitrary."

### D.      "means for receiving successive information units"

| Ambato's Construction | Defendants' Construction |
|---|---|
| a receiver or a tuner for receiving successive information units | Governed by 35 U.S.C. § 112(6).<br><br>Function:  receiving successive information units<br><br>Structure: a television receiver; VCR; cable interface box; GPS unit |

### 1.      The specification discloses a receiver or a tuner for receiving successive information units.

The '542 specification discloses a *receiver* for receiving successive information units. For example:  "… at least one *receiver*, operable to decode the successive information units…" *Id.* at 15:39-40 (emphasis added).  The '542 specification also discloses that the receiver can be in the form of a *tuner*.  For example:  "In this context, a 'receiver' is construed to include a variety of *tuner*-equipped devices such as television receivers, VCRs, cable interface boxes and the like, whereby a signal is selected."  *Id.* at 3:47-51 (emphasis added).  A *receiver* is also

shown in FIG. 6, a block diagram illustrating the components according to one embodiment of the invention.

A person with the ordinary skill in the art would understand what a receiver or tuner mean at the time of the '542 invention.  It simply means any receiver or any tuner that is capable of receiving successive information units.  This is supported by the '542 prosecution history.  For example, in response to a rejection under 35 U.S.C. § 112, ¶1, patentees "provided the examiner with copies of technical articles showing that the specific hardware elements and interconnections needed to practice the disclosed invention would have been within the level of ordinary skill in the art without undue experimentation, provided the person of ordinary skill sought to proceed as discussed in applicant's disclosure."  Ex. B at AMBATO 087.  The Examiner accepted the patentees' argument and the rejection under 35 U.S.C. § 112, ¶1 was then withdrawn.  *See*, Notice of Allowability of the '545 patent.  Ex. B at AMBATO 093-095.

And, even Defendants use the term "receiver" interchangeably with "means for receiving", *e.g.*, in their proposed construction of the term "coupled to a memory."

> **2.     Even if it is a means-plus-function term, the structure in Defendants' proposed construction is too narrow and ignores the overall specification.**

If the Court construes the term "means for receiving" as a means-plus-function term, Ambato will agree with Defendants that its function is for receiving successive information units; but Ambato disagrees with Defendants as to its structure.

A claim term should not be construed as isolated passages, but should be construed "in view of the specification."  *Phillips*, 415 F.3d at 1315.  Defendants improperly limit the term's structure to "a television receiver, VCR, cable interface box, or GPS unit."  Defendants' proposed structure arises from a single sentence of the '542 specification:  "In this context, a 'receiver' is construed to include a variety of tuner-equipped devices such as *television receivers*,

21

VCRs, *cable interface boxes* and the like, whereby a signal is selected."  Ex. A at 3:47-51

(emphasis added).  Defendants attempt to limit this term's structure to several enumerated items

found in one single sentence and completely ignore the rest of specification, especially FIG. 6.

In addition, the '542 specification refers to portable receivers, such as those in vehicles and then

specifically refers to automobile radios.  *Id.* at 14:42- 60.  Hence, Defendants' improperly

narrowed structure construction should be rejected.

Accordingly, if the Court construes the term "means for receiving" as a means-plus-

function term, its structure should be "a receiver or a tuner, or its equivalent."

### E.      "coupled to a memory"

| Ambato's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning; however, to the extent that this term must be construed, it is synonymous with "associated with a memory." | a memory that is separate from but connected to the input means and the receiver. |

### 1.      "coupled to a memory" should have its plain and ordinary meaning – "associated with a memory."

No intrinsic evidence provides a special meaning for the term "coupled to a memory" in

the claims of the '542 patent.  Hence, the ordinary and customary meaning to a person of

ordinary skill in the art at the time of the invention applies.  *Phillips*, 415 F.3d at 1313.  Where

an ordinary meaning is readily apparent, the court should simply apply the widely accepted

meaning of the commonly understood words.  *Id.* at 1314.  Ambato proposes that this term

should mean "associated with a memory" – its ordinary and customary meaning.  Ambato's

proposed construction is simple and, more importantly, does not change the original meaning of

this term.

Extrinsic evidences support Ambato's proposed construction.  Dictionaries and treatises

may be consulted and even used to construe claim terms as long as they do not contradict the

intrinsic evidence. *Id.*, 415 F.3d at 1322-1323. Ambato's proposed construction is supported by

dictionary definitions of "couple" from various sources. In general, "couple" means "associate."

"12. to associate, put, or connect together: *history is coupled with sociology.* 13. to link (two

circuits) by electromagnetic induction." Ex. C at AMBATO 37076. When used in the field of

electricity (the same field of the '542 patent), "couple" also means "associate." "*Electricity*. a. to

join or associate by means of a coupler. b. to bring (two electric circuits or circuit components)

close enough to permit an exchange of electromagnetic energy." Ex. C at AMBATO 37075.

Therefore, the term "coupled to a memory" should mean "associated with a memory," its

plain and ordinary meaning.

> **2.      The limitation "separate from but connected to the input means and
>           the receiver" in Defendants' proposed construction is imported from
>           a preferred embodiment.**

Ambato did not select this term for claim construction when parties exchanged the list of

claim terms pursuant to P.R. 4-1, because this term's plain and ordinary meaning is simple and

straightforward, and any forced construction such as Defendants' would be cumbersome,

unnecessary, and potentially distorting of the term's original meaning. Defendants' proposed

construction apparently comes from FIG. 6, which depicts "receiver," "memory," and "input"

components. FIG. 6, however, merely illustrates one embodiment of the invention featured in

the '542 patent. As described in the '542 specification, FIG. 6 only "generally" shows the

hardware aspects of the invention and in no way limits the arrangement of and the interaction

among components. Ex. A at 15:27. This is another attempt by Defendants to import a

limitation from an embodiment described in the specification into the claims. The Federal

Circuit has "expressly rejected the contention that if a patent describes only a single

embodiment, the claims of the patent must be construed as being limited to that embodiment."

*Phillips*, 415 F.3d at 1323. Hence, this attempt must fail.

Even if, *arguendo*, FIG. 6 limits the component arrangement and interaction in the invention featured in the '542 patent, "memory" does not need to be "separate from but connected to the input means and the receiver," as proposed by Defendants.  FIG. 6 is a block diagram showing the *logic* relationship; it does not define the physical locations or arrangements of the components.  For example, as one of the dictionary definitions of "couple" suggests, coupling in the field of electricity can mean linking two electronic circuits by electromagnetic induction.  Ex. C at AMBATO 37076.  Neither physical separation nor physical connection is required for coupling.

Therefore, the extra limitation in Defendants' proposed construction should be rejected; the term "coupled to a memory" should have its plain and ordinary meaning – "associated with a memory."

### F.    "location selection code"

| Ambato's Construction | Defendants' Construction |
|---|---|
| variable code indicating a selected geographic location or area | a variable code that identifies a location of interest selected by the user |

Both Ambato and Defendants agree that the location selection code is a variable code. As set forth above, "variable" should mean "arbitrary."  See Section IV-C above for details.

### 1.    "location" means "geographic location or area."

As discussed in the section above about the term "location designation code," the word "location" here means "geographic location or area."  See Section IV-B.1 for details.

### 2.    Selection "by the user" is not required.

The '542 patent does not limit how the selection is made – the selection can be done "by a variety of methods," either by user or not by user.  Ex. A at 3:25.  In many situations, the location selection is automatically defaulted to a selection based on the location of the receiver –

not selected by the user.  For example:  "The processor has a stored location selection, which can default to a selection based on the location of the receiver."  *Id*. at 14:1-3.  The user can (or has the ability to) override the default location selection; but the user is certainly not required to.  For example:  "The processor has a stored location selection, which can default to a selection based on the location of the receiver, and which *can* include or be replaced by any arbitrary selection made from user input."  *Id.* at 14:1-5 (emphasis added).  "The user of the receiver, rather than only the broadcaster, *has the ability to* define which geographic area or areas are of interest to the user."  *Id.* at 5:6-9 (emphasis added).  *See also, Id.* at 14: 54- 58.

Defendants' proposed construction attempts improperly to limit the scope of the claim to that of a preferred embodiment:  "In this respect … location selection information which is *preferably* input to the system by the user …"  *Id.* at 1:67-2:4 (emphasis added).  This attempt should be rejected.

Therefore, "location selection code" should mean "variable code indicating a selected geographic location or area."

G.      "**input means coupled to the memory for loading said location selection code**"

| Ambato's Construction | Defendants' Construction |
|---|---|
| means-plus-function term subject to 35 U.S.C. §112, ¶6<br><br>Function: Loading said location selection code<br><br>Structure: A user input device or an automatic location-determination device, or its equivalent | Governed by 35 U.S.C. § 112(6).<br><br>Function: loading the location selection code<br><br>Structure: switch;  altitude sensing unit; keypad |

Ambato and Defendants agree that this term is a means-plus-function term subject to 35 U.S.C. §112, ¶6 and agree that the function of this means-plus-function is "loading the location selection code."  Ambato and Defendants, however, disagree as to the structure of this means-plus-function term.

1.     **The input means can be a user input device or an automatic location-determination device, or its equivalent.**

The '542 specification explicitly declares that the input means can be both devices operated by the user and devices determining locations automatically.  In particular, the input means can take the form of a dynamic global positioning system (GPS) (*Id.* at 14:54), a roadside location transmitter (*Id.* at 14:54), preprogrammed route information (*Id.* at 14:55), a portable geographic reporting unit (*Id.* at 14:61), an automatic location sensor (*Id.* at 20:27), as well as any input devices operable by the user (*Id.* at 3:60, 14:5).  Thus, the structure of the input means includes a user input device or an automatic location-determination device, or its equivalent.

2.     **The structure in Defendants' proposed construction is too narrow and ignores preferred embodiment.**

Defendants attempt to limit the structure of input means to a few examples cherry-picked out of the '542 specification.  Those few examples picked by Defendants (i.e., switch; altitude sensing unit; keypad) are incomplete and in no way limit the structure of the input means.  More importantly, Defendants' proposed structure ignores a preferred embodiment (i.e., GPS) when the invention is adopted in vehicles.  In particular, "[f]or vehicles, a *portable geographic reporting unit*, such as a *Global Positioning System (GPS)* unit can be supplemented with an *altitude sensing unit* to encode elevation data.  This position sensing means is coupled to the set-top unit to provide the necessary location information."  *Id.* at 14:61-66 (emphasis added).

Defendants' proposed structure includes an "altitude sensing unit."  Ironically, the term "altitude sensing unit" appears only once in the body of the '542 specification, that is, in the sentence cited above – the same sentence where the preferred embodiment (a GPS unit) is explicitly listed.  Yet Defendants chose to see the "altitude sensing unit" but managed to ignore

the "Global Positioning System (GPS) unit."  As discussed earlier, a claim construction that

reads out a preferred embodiment "is rarely, if ever, correct."  *Vitronics Corp.*, 90 F.3d at 1583.

Therefore, the structure of "input means" should be "a user input device or an automatic

location-determination device, or its equivalent."

**H.**     "**means for comparing the location selection code from the input means with the location designation codes of the successive information units as received by said means for receiving, and identifying an overlap**"

| Ambato's Construction | Defendants' Construction |
|---|---|
| means-plus-function term subject to 35 U.S.C. §112, ¶6 | Governed by 35 U.S.C. § 112(6). |
| Function: Comparing the location selection code from the input means with the location designation codes of the successive information units as received by said means for receiving, and identifying an overlap | Function: comparing the location selection code from the input means with the location designation codes of the successive information units as received by said means for receiving, and identifying an overlap |
| Structure: Hardware or software used for comparing, or its equivalent | Structure:  indefinite; the patent fails to provide any details, such as an algorithm, of the (data) processor or comparator |

Ambato and Defendants agree that this term is a means-plus-function term subject to 35

U.S.C. §112, ¶6 and agree that the function of this means-plus-function is "comparing the

location selection code from the input means with the location designation codes of the

successive information units as received by said means for receiving, and identifying an

overlap."  Ambato and Defendants, however, disagree as to the structure of this means-plus-

function term.

**1.     The specification provides enough structure details for "means for comparing."**

Defendants allege that this means-plus-function term is indefinite because it lacks

structure details.  In particular, Defendants have relied on *WMS Gaming, Inc. v. Int'l Game

Tech.*, 184 F.3d 1339 (Fed. Cir. 1999) and assert that the '542 specification fails to provide any

algorithm.  *WMS Gaming* does not apply here.  In *WMS Gaming*, the function for "means for assigning" is carried out on a general-purpose microprocessor.  *WMS Gaming, Inc.*, 184 F.3d at 1348.  When this occurs in the context of a means-plus-function, the structure is no longer the general-purpose microprocessor itself, but the general-purpose processor executing an algorithm (effectively turning the general-purpose processor into a special-purpose processor).  *Id.* at 1348-1349.  Turning a general-purpose processor into a special-purpose processor (with an algorithm) occurs, however, only if the means-plus-function's structure starts as a general-purpose processor.  It is not the case here for "means for comparing" in the '542 patent.

The structure for "means for comparing" in the '542 patent can be a comparator (*not* a general-purpose processor).  "According to a preferred embodiment, a set-top receiver such as a cable interface device or the like includes a processor, or at least a *comparator*, which is encoded at least with its own geographic location, e.g., via latitude, longitude, and preferably altitude." Ex. A at 3:52-56 (emphasis added).  The comparator can be implemented in software or hardware.  The '542 specification does not provide implementation details of the comparator because they are within the level of ordinary skill in the art without undue experimentation at the time of the invention.  Ex. B at AMBATO 087.  The Examiner was apprised of this position and issued a Notice of Allowability soon after this explanation was provided, obviously agreeing with the patentees' straightforward position.  Ex. B at AMBATO 093-095.  Hence, the structure for "means for comparing" is "hardware or software used for comparing, or its equivalent."

> **2.    Even if *WMS Gaming* applies, the '542 specification provides ample details about the algorithms of "means for comparing."**

Even if, *arguendo*, *WMS Gaming* applies to "means for comparing" here, the '542 specification provides ample details about the algorithms executed on the general processor for

"means for comparing."  That is, any geometric intersection algorithm or any matching

algorithm.

Examples describing the algorithm in the '542 specification include:

- "The *intersection* of polygons or polygons and points, as determined by the data processor, determines whether particular information is selected or ignored."  Ex. A at 6:24-27 (emphasis added).
- "[A message's] relevance is determined by whether or not its *geometric intersection* with designated regions of interest of the receiver is a non-empty region."  *Id.* at 7:55-58 (emphasis added).
- "When a message has a *non-empty intersection* with a region of interest, the message is said to be of 'interest'."  *Id.* at 8:10-11 (emphasis added).
- "By a suitable comparison of the polygonal edges of the defined regions using *a series of less-than, greater-than comparisons*, the data processor can determine an *intersection* or a lack thereof."  *Id.* at 10:4-8 (emphasis added).

An example of such an algorithm is illustrated in FIG. 3 of the '542 patent.  The '542

specification even explicitly states that "[s]tandard *geometric intersection algorithms* can be used

to test for containment or intersection."  *Id.* at 13:8-10 (emphasis added).  FIG. 5 further

illustrates one such algorithm as an intersection test.  "Block 506 represents *an intersection test*:

is the intersection of the region of the message with the set top unit's regions of interest non-

zero?"  *Id.* at 14:6-9 (emphasis added).

Accordingly, the '542 specification provides ample details about the algorithms executed

on the general processor for "means for comparing", that is, any geometric intersection algorithm

or any matching algorithm.

I.      "**comparing the location selection code … with the location designation codes**"

| Ambato's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning; however, to the extent that this term must be construed, it is synonymous with "examining the location selection code and the location designation codes in order to note similarities and differences." | comparing the geographic region defined by the location selection code with the geographic regions defined by the location designation codes |

### 1. "location" means "geographic location or area."

As discussed in the section above about the term "location designation code," the word "location" here means "geographic location or area."  See Section IV-B.1 for details.

### 2. The word "compare" should have its plain and ordinary meanings – "examine in order to note similarities and differences."

No intrinsic evidence provides a special meaning for the term "compare" in the claims of the '542 patent.  Hence, the ordinary and customary meaning to a person of ordinary skill in the art at the time of the invention applies.  *Phillips*, 415 F.3d at 1313.  Where an ordinary meaning is readily apparent, the court should simply apply the widely accepted meaning of the commonly understood words.  *Id.* at 1314.  The plain and ordinary meaning of "compare" is "to examine (two or more objects, ideas, people, etc.) in order to note similarities and differences."  Ex. C at AMBATO 37064.

### 3. Defendants' proposed construction contains the construction of "overlap" and therefore is redundant and unnecessary.

Each word adds meaning to the claim and no word is superfluous or redundant to the claim.  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004).  The term "comparing the location selection code … with the location designation codes" describes half of the function for "means for comparing" in claim 36.  The other half of the function for "means for comparing" is "identifying an overlap."  The parties have agreed to the construction of the term "overlap" – "intersection of the geographic location or area indicated by the location selection code and the geographic location or area indicated by the location designation code."  See the beginning of Section IV for details.  Defendants' proposed construction for "comparing the location selection code … with the location designation codes" contains at least a portion of the agreed construction of the term "overlap", and therefore is redundant and unnecessary.

Therefore, "comparing the location selection code … with the location designation codes" should simply mean "examining the location selection code and the location designation codes in order to note similarities and differences."

### J.      "as received"

| Ambato's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning; however, to the extent that this term must be construed, it is synonymous with "when received." | This phrase should be construed in accordance with its plain and ordinary meaning to require that the information received is processed immediately without modification or other alteration |

### 1.      "as received" should have its plain and ordinary meaning – "when received."

No intrinsic evidence provides a special meaning for the term "as received" in the claims of the '542 patent.  Hence, the ordinary and customary meaning to a person of ordinary skill in the art at the time of the invention applies.  *Phillips*, 415 F.3d at 1313.  Where an ordinary meaning is readily apparent, the court should simply apply the widely accepted meaning of the commonly understood words.  *Id.* at 1314.  The plain and ordinary meaning of "as" is "at the same time that; while; when: as you look away."  Ex. C at AMBATO 37063.  Thus, the term "as received" simply means "when received," and nothing more.

### 2.      The information received is not required to be "processed immediately without modification or other alteration."

Defendants labor to construe a two-word term "as received" in a long and complicated sentence.  No intrinsic evidences support Defendants' position that the information received must be processed immediately without modification or other alteration.  FIG. 7 of the '542 patent is a flow diagram showing the steps of encoding, transmitting, inputting, receiving, comparing, and processing according to one embodiment of the invention.  But nothing in FIG. 7 and the rest of the '542 specification requires that the information received must be

"immediately" processed "without modification or other altercation."  The flow diagram does

not preclude any intermediary steps of processing after the information is received but before it

is compared/processed.



FIG. 7

In fact, the '542 specification teaches the opposite.  For example, in one embodiment, the

location information can be modified or altered between two coordinate systems after it is

received and before it is compared or processed.

> "However, for purposes of convenience such as in defining a location of interest
> within a certain distance (e.g., walking distance, where the definition of walking
> distance might be variable, such as for a marathon runner and a person suffering
> from arthritis) from the set-top unit, can be processed as relative coordinates 216
> and *converted back and forth* between relative coordinates 216 and absolute

32

coordinates 206.  Similarly, one coordinate system can be converted into another using simple calculations of this type."  Ex. A at 9:47-56 (emphasis added).

Accordingly, Defendants' proposed construction requiring information be "processed immediately without modification or other alteration" has no basis and should be rejected.

### 3.     Defendants' proposed construction is not plain and ordinary meaning.

Defendants assert that their construction is in accordance with the term's plain and ordinary meaning.  Not so.  No extrinsic evidences for the word "as" support the concept of "immediately" or "without modification or other alteration."  This is another of Defendants' attempts to manufacture limitations into the claims in order to construct non-infringement arguments.

Therefore, "as received" should mean "when received."

### K.     means for processing selected ones of the information units as a function of said overlap"

| Ambato's Construction | Defendants' Construction |
|---|---|
| means-plus-function term subject to 35 U.S.C. §112, ¶6<br><br>Function: Processing selected ones of information units as a function of overlap<br><br>Structure: A processor executing an algorithm that handles messages as a function of overlap<br><br>Algorithm: If there is an overlap, process the message one way; if there is no overlap, process the message a different way. | Governed by 35 U.S.C. § 112(6).<br><br>Function: processing selected ones of the information units as a function of said overlap<br><br>Structure:  indefinite; the patent fails to provide any details, such as an algorithm, of the (data) processor |

Ambato and Defendants agree that this term is a means-plus-function term subject to 35 U.S.C. §112, ¶6 and agree that the function of this means-plus-function is "processing selected ones of the information units as a function of said overlap."  Ambato and Defendants, however, disagree as to the structure of this means-plus-function term.

### 1. The structure is a general processor.

FIG. 6 of the '542 patent illustrates the hardware aspects of an embodiment according to the invention. Processing means is depicted as a "processor" in FIG. 6. The '542 specification does not provide significant additional implementation details about the processor since they are within the level of ordinary skill in the art without undue experimentation at the time of the invention. Ex. B at AMBATO 087. The Examiner issued a Notice of Allowability soon after the applicant made this straightforward point, obviously agreeing with the patentees. Ex. B at AMBATO 093-095. Thus, the structure for "means for processing" is a general processor.

### 2. The specification provides ample details about the algorithms executed on the general processor.

Defendants allege that this means-plus-function term is indefinite because it lacks the structure details for algorithms, again citing *WMS Gaming*. Contrary to Defendants' position, the '542 specification provides abundant disclosures and spells out numerous examples of the algorithms running on the general processor as the processing means. So long as the disclosure defines structure to render the bounds of the claim understandable to one of ordinary skill in the art, the specification need not disclose a specific formula or mathematical equation, and text or a flowchart may sufficiently disclose an algorithm. *All Voice Computing PLC v. Nuance Commc'n, Inc.*, 504 F.3d 1236, 1245 (Fed. Cir. 2007).

The algorithm does not limit the processor to a single action. Instead, the algorithm can drive the processor to perform "a plurality of actions, including but not limited to displaying the message on the screen." Ex. A at 14:18-20. For example, the algorithm can also be to "store information, generate an alarm, or otherwise to alert the user" as a function of overlap (i.e., if a message is of interest). *Id.* at 4:53-54. But the location specific information in a message of interest "is not necessarily displayed, but is processed differently than information which is not

of interest, and normally ignored entirely." *Id.* at 11:23-26.  "Messages which are not of interest preferably are not processed beyond the extent required to determine their interest." *Id.* at 8:14-16.  But it is also possible that "*such messages [not of interest] simply could be processed differently than those of interest.*" *Id.* at 8:17-19 (emphasis added).

Accordingly, the structure of "means for processing" should be a processor executing an algorithm that handles messages as a function of overlap.  The algorithm executed on the general processer for "means for processing" is simply:  If there is an overlap, process the message one way; if there is no overlap, process the message a different way.

L.      "**automatic location sensor**"

| Ambato's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning; however, to the extent that this term must be construed, it is synonymous with "a device sensing location automatically." | a sensor that determines the location of the receiver without manual input from the user |

1.      **This term requires no construction beyond its plain and ordinary meaning – "a device sensing location automatically."**

No intrinsic evidence provides a special meaning for the term "automatic location sensor" in the claims of the '542 patent.  Hence, the ordinary and customary meaning to a person of ordinary skill in the art at the time of the invention applies.  *Phillips*, 415 F.3d at 1313.  Ambato proposes that this term should mean "a device sensing location automatically," its ordinary and customary meaning.

2.      **Defendants' proposed construction is unnecessarily complicated.**

Ambato did not select this term for claim construction when parties exchanged the list of claim terms pursuant to P.R. 4-1, because this term's plain and ordinary meaning is simple and straightforward, and any attempted construction would likely be cumbersome and unnecessary. Here, Defendants' proposed construction turns a three-word simple and straightforward term into

a fifteen-word construction.  Every person with ordinary skill in the art at the time of the

invention knows what the word "automatic" means.  Where an ordinary meaning is readily

apparent, the court should simply apply the widely accepted meaning of the commonly

understood words.  *Id.* at 1314.  There is simply no need to interpret a single straightforward

word "automatic" with the additional limitation that it be entirely "without manual input from the

user."  Virtually any automatic gauge can be set, adjusted or turned on or off.  In contrast,

Ambato's proposed construction is simple and straightforward and, more importantly, is less

likely to be applied in a manner that changes the original meaning of this term.  Ambato's

proposed construction should be adopted.

Therefore, "automatic location sensor" should simply mean "a device sensing location

automatically."

## V.        CONCLUSION

For the reasons set forth above, Ambato respectfully requests that the Court adopt

Ambato's proposed claim constructions, which are summarized in Exhibit D, attached.


Respectfully submitted,


Dated:  April 26, 2011


**AMBATO MEDIA, LLC**

By:   /s/  Ping Hu_____

Michael Charles Smith
Texas State Bar No. 18650410
Email: michaelsmith@siebman.com
SIEBMAN REYNOLDS BURG
     PHILLIPS & SMITH LLP
713 South Washington
Marshall, TX 75670
Telephone: (903) 938-8900
Facsimile: (972) 767-4620

*Of Counsel:*

H. Joseph Hameline
*Pro Hac Vice*
Ping Hu
*Pro Hac Vice*
MINTZ, LEVIN, COHN, FERRIS,
    GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA  02111
Telephone: (617) 542-6000
Fax: (617) 542-2241
Email: HJHameline@mintz.com
Email: PHu@Mintz.com

*Attorneys for the Plaintiff Ambato Media, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served upon counsel of record by electronic service, pursuant to the Federal Rules of Civil Procedure and the Local Rules for the Eastern District of Texas, on 26th day of April, 2011.

           /s/   Ping Hu_____
              Ping Hu

5375096